## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) WILLIAM MANNA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-CV-500-TCK-FHM** |
| | ) | |
| **(1) PHILLIPS 66 COMPANY and** | ) | |
| **(2) PHILLIPS 66 SEVERANCE PAY** | ) | |
| **PLAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court are (1) Defendant Phillips 66 Company's Motion for Summary Judgment and Brief in Support ("Motion for Summary Judgment") (Doc. 49) and (2) the parties' briefs regarding Plaintiff's claim for benefits under the Employment Retirement Income Security Act ("ERISA"), pursuant to the Court's July 26, 2017 ERISA Scheduling Order (Doc. 35): (a) Plaintiff's Opening Brief (Doc. 48), (b) Defendant Phillips 66 Severance Pay Plan's Response Brief (Doc. 53), and (c) Plaintiff's Reply Brief (Doc. 58).

**I.     Factual Background[1]**

    **A.     Employment Background**

In 1997, Plaintiff was hired by a predecessor company of Defendant Phillips 66 Company ("Phillips") as an engineer. In 2008, Plaintiff was transferred from New Jersey and began working in the procurement group in Bartlesville, Oklahoma. Plaintiff's job responsibilities included assisting various company employees, business units, and refineries with negotiating contracts for supplies and services. In December of 2013, Plaintiff was promoted to Lead of the Strategic Sourcing Group. In

---

[1] The following facts are undisputed or as set forth by Plaintiff in his Response to Phillips' Motion for Summary Judgment (Doc. 51).

2014, Plaintiff became the direct supervisor of Michelle Tarter ("Tarter"), then a Strategic Sourcing Analyst.

In September of 2014, Plaintiff was removed from a supervisory role over Tarter; however, throughout the remainder of his employment he continued to work with Tarter and another employee, Mike Siegfried ('Siegfried"), in the Bartlesville office.[2] Also in September of 2014, Rebeca Ginyovszky ("Ginyovszky") became Plaintiff's supervisor. When Plaintiff was reporting to Ginyovszky, Ginyovsky's job title was Strategic Sourcing Director in procurement and her office was located in Houston, Texas. Ginyovszky also supervised Tarter and other employees working in Houston in the procurement group.

Plaintiff was a salaried employee and had no published work shift or timekeeping requirement. (Manna Aff., Pl.'s Ex. 1, at ¶ 8.) Plaintiff was able to perform work duties remotely from his laptop computer. Plaintiff's position required approximately 30 percent to 40 percent travel. (Manna Aff. at ¶ 9.) When Plaintiff was not traveling, his weekday work hours at the office began around 8:30 or 9:00 a.m. and ended around 5:30 p.m. Plaintiff periodically worked after-hours or on weekends at home, depending upon his workload. (*Id.* at ¶ 10; *see also* Ginyovszky Dep., Pl.'s Ex. 4, at 80-81.) Tarter stated in deposition testimony that she had received communications concerning business from Plaintiff, including phone calls, text messages, and emails, on weekends and on weekdays after 5:00 p.m. (Tarter Dep., Pl.'s Ex. 3, at 18-19.)

---

[2] Plaintiff disputes that he was removed from the "lead" position based on work performance or that Siegfried was in his chain of command or was his supervisor.

### B. Plaintiff's 2014 Performance Review and Discipline[3]

Before 2015, Plaintiff's overall performance ratings were at or above the "Met Standards" level, including "Exceptional" ratings in 2005 and in 2008 through 2011. (Pl.'s Ex. 5.) In 2010 and 2013, Plaintiff received salary grade promotions as the "corporate winner" for the procurement department. (Manna Aff. at ¶ 5.) Ginyovszky stated in deposition testimony that Plaintiff was "very knowledgeable in terms of the technical aspect," "was a valuable asset," "took a lot of pride in his work," and "had done a good job." (Ginyovszky Dep. at 75-76.) On March 3, 2015, Ginyovszky completed a 2014 Performance Agreement on Plaintiff. Ginyovszky rated Plaintiff's overall job performance for 2014 as 3.6 out of 5, which was rounded up to 4, or "Below Expectations."[4]

On May 21, 2015 Ginyovszky issued to Plaintiff a written warning for "routine late arrival to the office" (the "May Warning"). (Pl.'s Ex. 7.) She instructed Plaintiff to be "at the office no later than 9:00 a.m." and "communicating with [Ginyovsky] when [Plaintiff] would not be in the office or not able to make the designated time frame." (*Id.*) Prior to the May Warning, Plaintiff had never been disciplined for attendance or tardiness. (Manna Aff. at ¶ 7.) Ginyovszky testified she became aware that Plaintiff was coming into work late in Bartlesville from an anonymous letter which she has never

---

[3] Plaintiff filed a Motion in Limine (Doc. 60) seeking the exclusion of, *inter alia*, "[a]ny testimony, documents, other evidence, or reference [to] anything other than attendance as a reason [for] his termination." (Pl.'s Mot. in Limine 4.) Plaintiff contends such evidence is not relevant because the notice of termination he was given only mentions Plaintiff's attendance record, and argues that the probative value of such evidence is substantially outweighed by the danger of unfair prejudice to Plaintiff. However, as Phillips notes in its opposition to the Motion in Limine, Plaintiff himself has suggested several different theories in this case as to why he was terminated. The Court will consider such evidence where it may be relevant, as Plaintiff has not shown that any unfair prejudice substantially outweighs the probative value of evidence of other reason(s) for his termination.

[4] Plaintiff admits this fact but contends it is not material.

seen. (Ginyovszky Dep. at 44:9-21.)[5]  Ginyovszky did not instruct anyone to keep a log of Plaintiff's arrival to work in Bartlesville.  (*Id.* at 71:2-72:2.)  In mid-June of 2015, Plaintiff met with Ginyovszky and Turner regarding Plaintiff's performance. In this meeting, Plaintiff did not receive performance criticism and was not issued further corrective discipline.  (Manna Aff. at ¶ 30.)

### C.    July 2015 Trip to Houston

On July 14, 2015 Plaintiff worked part of the day and then traveled to Houston to meet with members of the procurement group, including Ginyovszky.  Plaintiff's mid-year review with Ginyovszky was scheduled for 2:00 p.m. on July 15.  The morning of July 15, Plaintiff worked on his computer at his hotel room in Houston and arrived at Phillips headquarters around noon.  (*Id.* at ¶ 21.) While Plaintiff was meeting with a colleague named Erin Powers, Rupert Turner ("Turner") arrived and escorted Plaintiff to an office.  Plaintiff had not previously seen or spoken to Ginyovszky or Turner that day.  (*Id.* at ¶ 22.)  Plaintiff was then escorted to the office of Dr. William Parsons ("Parsons"), Chief Medical Director, where he underwent an alcohol test, a five-panel urine test, and a blood sugar test.  The results of the tests were negative.  Plaintiff had never before met Parsons, and Parsons had never been involved in evaluating Plaintiff's work performance.  (*Id.* at ¶ 24.)

### D.    Leave of Absence and Termination

During Plaintiff's examination on July 15, Parsons indicated that something "was wrong" with Plaintiff and told Plaintiff that he was removed from work.  (Manna Aff. at ¶ 26.)  Phillips placed Plaintiff on short-term disability and Family Medical Leave Act ("FMLA") leave and sent him home. Plaintiff's return to work was conditioned upon the results of additional exams and drug/alcohol tests by his primary physician in Oklahoma and with Phillips' staff physician at the company's Bartlesville

---

[5]  According to Plaintiff, this letter was not produced in discovery.

facility. (Ginyovszky Dep. at 39:11-40:9; Pl.'s Ex. 10.) Phillips sent Plaintiff a letter dated July 16, 2015, stating that his short-term disability would extend "until you are fully released to return to work and our medical team has reviewed and approved the Employee Health Report." (Pl.'s Ex. 11.) Plaintiff returned to Bartlesville by jet and drove himself home that night. (Miller Dep. at 19:3-20.)

Although Plaintiff had passed all examinations and tests, Parsons was also concerned that there was "something else there" in relation to Plaintiff's health, according to Linda Miller ("Miller"), an HR employee in Houston. (Miller Dep., Pl.'s Ex. 2, at 15.) Ginyovszky was concerned that Plaintiff was impaired "health-wise," "alcohol-wise" or relating to a "substance." (Ginyovszky Dep. at 38:2-5.) However, Ginyovszky did not complete a Supervisor's Checklist to support additional tests. (*Id.* at 83:6-15.) Parsons instructed Plaintiff's personal physician to complete an "Employee Health Report" on Plaintiff. (Miller Dep. at 20:21-22:17; Pl.'s Ex. 11.) After Plaintiff saw his personal physician, Parsons reported that all additional lab tests were negative and that Plaintiff's physician had deemed him "completely 'normal.'" (Pl.'s Ex. 12.) Parsons noted that "if he is now 'normal,' he discontinued using whatever substance that could have given him these symptoms." (*Id.*). Plaintiff was instructed to undergo a third examination with Dr. Karen Ryan ("Ryan"), Associate Medical Director for Phillips, to clear Plaintiff prior to his return. (*See id.*) On July 24, 2015, a Friday, Plaintiff was examined by Ryan and was released to work without restrictions. (Pl.'s Ex. 13.)

When Plaintiff arrived at work on Monday, July 27, 2015, he met with Tom Schroeder ("Schroeder"), an HR employee in Bartlesville. After meeting with Plaintiff, Schroeder completed a summary of his assessment of Plaintiff, noting that Plaintiff denied any drug or alcohol use and stating that "if he had anything going on in the outside impacting his behavior now is the time to come forward and see [the employee assistance program ("EAP")]," and that "we want to ensure that he is

clean." (Pl.'s Ex. 15.) The same day, Miller noted in an email that Plaintiff "is acting 'clean' at the moment" and that Schroeder had "essentially given him the EAP speech." (Pl.'s Ex. 16.)

Plaintiff worked for approximately one week then took a previously scheduled three-day vacation. (Manna Aff. at ¶ 29.) When Plaintiff returned from vacation, Phillips terminated his employment on August 6, 2015. Plaintiff was given a document signed by Ginyovszky stating that Plaintiff had "repeated the same or similar conduct for which [he was] warned." (Pl.'s Ex. 17.) After his return from leave, Plaintiff was not counseled or disciplined. (Manna Aff. at ¶ 35.) The only specific dates identified by Ginyovszky that Plaintiff violated the May Warning are July 14 and July 15, 2015. (Ginyovszky Dep. at 55:8-56:17.) At his termination, Plaintiff had worked at Phillips for approximately eighteen years. (*Id.* at ¶ 3.)

Under company policy, Ginyovszky was required to complete a mid-year review of Plaintiff by July 31, 2015. Plaintiff submitted to Ginyovszky a draft of his portion of the mid-year review. (*Id.* at ¶ 32.) However, Ginyovszky never issued Plaintiff's mid-year review. (*Id.* at ¶¶ 33-34.) Before Plaintiff's termination, Ginyovszky had seen Plaintiff in person approximately five or six times. (Ginyovszky Dep. at 29:10-19.)

Plaintiff had never failed any drug or alcohol test during his eighteen years of employment with Phillips. (Manna Aff. at ¶ 27.) Plaintiff maintains that he does not and has not had a mental infirmity or illness and has not been treated for alcohol or substance abuse. Since his termination, he is gainfully employed within his field. (*Id.* at ¶ 25.)

### E.    Substance Abuse Policy and Procedures

During the last year of Plaintiff's employment, Phillips' "US Substance Abuse Policy" and "U.S. Substance Abuse Company Non-DOT Procedures" were in place and applicable to Plaintiff.

The US Substance Abuse Policy provides in part that employees are prohibited from using any substance that "may alter an individual's mood, perception, coordination, response, performance or judgment" while on the job or company property. The US Substance Abuse Policy and U.S. Substance Abuse Company Non-DOT Procedures provide that employees may be subject to drug and alcohol testing in cases where at least two supervisors observe physical signs and symptoms consistent with substance abuse or unsatisfactory work performance. Follow-up drug and alcohol testing by Phillips is prescribed only after the employee has successfully completed a required drug treatment program. (Drug & Alcohol Testing Policy, Defs.' Ex. 9, at §§ II. E-F.)

### F.  Procedural History

On July 27, 2016, Plaintiff filed this action, asserting claims against Phillips for discrimination under the Americans with Disabilities Act of 1990 ("ADA"), discrimination by association under ADA, violation of the Oklahoma Testing Act, and retaliation under FMLA.[6] Subsequently, Plaintiff sought and was denied benefits under the Phillips 66 Severance Pay Plan (the "Plan"), which is governed by ERISA. On July 25, 2017, with leave of Court, Plaintiff filed a First Amended Complaint (Doc. 33) adding a claim against the Plan seeking review of the denial of ERISA benefits.

On October 2, 2017, Phillips filed a Motion for Summary Judgment and Brief in Support (Doc. 49) pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"), seeking summary judgment in its favor on all of Plaintiff's claims. On October 23, 2017, Plaintiff filed a response brief (Doc. 53) in opposition to the motion. In his response, Plaintiff confessed his ADA discrimination by association

---

[6] In their briefs on this motion, both parties also address a claim of interference under FMLA. The First Amended Complaint does not clearly assert such a claim; however, because both parties have addressed an FMLA interference claim, for the purpose of summary judgment the Court will assume that this claim was pleaded. In his response brief, Plaintiff confessed his claim for interference under FMLA. Accordingly, Phillips is entitled to summary judgment on this claim.

and FMLA interference claims. Pursuant to the Court's July 26, 2017 ERISA Scheduling Order, Plaintiff and the Plan submitted briefs on Plaintiff's ERISA benefits claim.

## II.    Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). In its summary judgment analysis, the Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim," but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed. R. Civ. P. 56(e)). To meet this burden, the nonmovant must set forth facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In response to a motion for summary judgment, a party cannot rest on ignorance

of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).

## B. ADA Disability Discrimination

Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2012). ADA discrimination claims based on circumstantial evidence are subject to the burden-shifting framework of *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A prima facie case of disability discrimination requires Plaintiff to show that: (1) he was a disabled person; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was fired because of his disability. *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1142 (10th Cir. 2011). If Plaintiff makes such a showing, the burden shifts to Phillips to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* at 1141. Plaintiff then bears the ultimate burden of showing that Phillips's proffered reason is a pretext designed to mask discrimination. *Id.*

The term "disability" means, with respect to an individual--

(A) a physical . . . impairment that substantially limits one or more major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1)(A)-(C).  Regardless of which type of "disability" is at issue, the term must be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter."  *Id.* § 12102(4)(A).

In this case, Plaintiff admits that he was not actually impaired during the relevant time period.  However, he asserts that he is disabled under § 12102(1)(C) because Phillips mistakenly regarded him as having a substance-related health issue.[7]  Under the "regarded as" prong, a person is considered disabled if "the individual establishes that he or she has been subjected to an action . . . because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A) (emphasis added).  Accordingly, unlike §§ 12102(1)(A) and (B), a "regarded as" claim pursuant to § 12102(1)(C) does not require the plaintiff to show he was perceived by the employer to be limited in a major life activity.[8]  The only other

_____

[7]  In the First Amended Complaint, Plaintiff also alleges that he had a record of an impairment as defined in §12102(1)(B).  However, by failing to argue in his response brief that he has a record of impairment, Plaintiff appears to have abandoned this theory.  The Court also notes that Plaintiff has not presented evidence of a record of disability.

[8]  In 2008, the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") removed the requirement that an impairment "substantially limit[] a major life activity" from the "regarded as" claim.  *See* Pub. L. No. 110–325, 122 Stat. 3553; *see also Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) ("Because of that amendment, a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity.").  Confusingly, Plaintiff argues in his brief that Phillips regarded him as being substantially limited in working, standing and speaking.  Compounding the confusion, in its reply brief, Phillips cites the pre-ADAAA construction of "regarded as" that required a plaintiff to prove his or her impairment substantially limited or was perceived to limit major life activities.  *See Adair v. City of Muskogee*, 823 F.3d 1297, 1305-06 (10th Cir. 2016) (noting that under ADAAA, "the employer need only regard the employee as being impaired, whether or not the employer also believed that the impairment prevented the employee from being able to perform a major life activity. . . Unlike pre-ADAAA plaintiffs, an ADAAA plaintiff no longer needs to plead and prove that the actual or perceived impairment 'substantially limited one or more major life activities.'"); *see also Keneipp v. MVM, Inc.*, No. 15-CV-565-JED, 2017 WL 3197732, at *3 (N.D. Okla. July 27, 2017) (citing *Adair*).

limitation on the definition of "impairment," for purposes of § 12102(1)(C), is that a condition may not be deemed an impairment if it is "transitory and minor." 42 U.S.C. § 12102(3)(B).

Plaintiff contends he was disabled because Phillips mistakenly believed that he had a substance-related health problem. "[T]he ADA protects employees who are erroneously regarded as being current illegal drug users." *Nielsen v. Moroni Feed Co.*, 849 F.3d 604, 610 (10th Cir. 1998). Phillips admits that on July 15, 2015, its employees observed that Plaintiff appeared impaired, having slurred speech and difficulty standing. Parsons observed Plaintiff had slowed affect and slurred speech that day.[9] Although Plaintiff's blood and urine tests were negative, Parsons believed that Plaintiff might be suffering from an unspecified medical condition or under the influence of some substance. Ginyovszky was concerned that there "was maybe another reason why he seemed impaired" and that he may have a physical or mental "health issue." (Ginyovszky Dep. at 35.) In addition, Schroeder suggested Plaintiff needed to "come clean" and accused him of defeating tests for drugs and alcohol. Therefore, Plaintiff has shown that a reasonable jury could find that Phillips considered Plaintiff to be impaired.

The Court would normally consider next the second and third elements of a prima facie claim, *i.e.*, whether Plaintiff qualifies for the job and whether he was terminated because of a perceived disability. However, Plaintiff's response brief fails to set forth the basic elements of a claim of ADA discrimination or to directly address the second and third prongs of a prima facie ADA discrimination claim. Because Phillips does not challenge Plaintiff's qualifications to perform his job, the Court assumes for the purpose of this analysis that Plaintiff satisfies the second prima facie element.

---

[9] Plaintiff denies both observations in Phillips's statement of facts. However, because Plaintiff must show that Phillips perceived him to be impaired, the Court assumes for the purpose of this analysis that certain employees perceived Plaintiff to have difficulty standing and speaking on July 15, 2015.

However, by failing to address the causation element, Plaintiff has failed to establish a prima facie claim of discrimination.

Even assuming *arguendo* that Plaintiff could establish the prima facie elements had he addressed them in his response brief, the Court finds that Plaintiff nonetheless has not met his burden to show that Phillips' proffered legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual. Phillips has produced evidence that in May of 2015, Plaintiff was warned for late arrivals and unreported absences; that on July 15, 2015 he did not arrive at the Houston office until after noon; and that on his final performance review, he was rated "Below Expectations." Therefore, Phillips has articulated legitimate, non-discriminatory reasons–*i.e.*, unsatisfactory job performance, including attendance–for terminating Plaintiff. Plaintiff has not met his burden to show these reasons are pretextual. "To support an inference of pretext . . . a plaintiff . . . must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson v. Weld City*, 594 F.3d 1202, 1211 (10th Cir. 2010). While Plaintiff cites evidence to suggest his performance was not poor enough to warrant termination, he has cited no evidence at all that Phillips' proffered reason was pretextual. Therefore, even if Plaintiff had established a prima facie claim of discrimination, he has not met his burden to support an inference of pretext by a preponderance of the evidence.

In summary, Plaintiff has failed to establish a prima facie claim of disability discrimination under ADA because he failed to present evidence showing causation. However, even if Plaintiff had established causation, he has failed to rebut Phillips' evidence that he was terminated based on attendance and performance, and not for any discriminatory reason. Accordingly, Phillips is entitled to summary judgment on this claim.

### C.   Oklahoma Testing Act

Plaintiff contends he is entitled to damages under under the Oklahoma Testing Act ("OTA") because he was improperly tested and discharged for suspicion of substance use. *See* OKLA. STAT. tit. 40, §§ 551 et seq. (2012). The OTA imposes certain obligations on "employers who choose to conduct drug or alcohol testing of job applicants or persons employed in this state." *Id.* at § 553(B). Under the OTA, "[a]ny person aggrieved by a willful violation of the [OTA] may institute a civil action in a court of competent jurisdiction within one (1) year of the alleged willful violation." *Id.* at § 563(A). "A willful violation of the [OTA] requires proof by the preponderance of the evidence that the employer had a specific intent to violate the [OTA]." *Id.*

The OTA does not expressly prohibit an employer from terminating an employee it suspects of using illegal drugs or alcohol after the individual tests negative. However, because OTA prescribes conduct for both the employer and employee and permits an action for lost income damages, Plaintiff argues that he can recover damages under OTA for conduct that is not expressly prohibited. Plaintiff relies on *Jones v. State ex rel. Office of Juvenile Affairs*, 268 P.3d 72 (2011), in which an individual was permitted to proceed with an action seeking lost wages after her termination. The employee had had two negative drug tests before her termination. However, it is far from clear in the facts set forth in *Jones* that the negative tests were connected to the employee's termination. Moreover, the court there focused on the narrow question of whether an employee was required to exhaust administrative remedies under Oklahoma law. Indeed, the court expressly disavowed any opinion on the merits of the plaintiff's cause of action. *Id.* at 79. Thus, *Jones* lends little, if any, support to Plaintiff's theory of recovery under OTA.

Plaintiff contends Phillips violated its own alcohol and drug testing policy by ordering additional drug and alcohol tests after Plaintiff left Houston on July 15, 2015, and failing to produce a required Supervisor Checklist for the second set of tests. Plaintiff argues that Phillips's violation of its own policy shows that it willfully violated OTA. However, Phillips's alleged violation of its drug testing policy by testing Plaintiff is not the cause of Plaintiff's lost income; rather, Plaintiff's alleged loss of income is due to his termination. In Oklahoma, "an employer may discharge an employee for good cause, for no cause or even for cause morally wrong, without being thereby guilty of legal wrong." *Burk v. K-Mart Corp.*, 770 P.2d 24, 26 (Okla. 1989). Plaintiff has not cited any applicable exception to this rule under OTA. Accordingly, Phillips is entitled to summary judgment on this claim.

### D.       FMLA Retaliation Claim

The FMLA "provides that eligible employees of certain employers have the right to take unpaid medical leave for a period of up to twelve work weeks in any twelve month period for a serious health condition as defined by the Act." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 959 (10th Cir. 2002). A "serious health condition" under FMLA "means an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 C.F.R. § 825.113(a). The FMLA prohibits an employer from discriminating against an employee for exercising rights under the FMLA. 29 U.S.C. § 2615(a)(2). FMLA retaliation claims are subject to the burden-shifting framework of *McDonnell-Douglas*. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006). To make out a prima facie FMLA retaliation claim, Plaintiff must show that (1) he engaged in protected FMLA activity; (2)

Phillips took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action. *Id.*

Plaintiff contends he was terminated for his leave of absence in July 2015 and that his leave was protected because under FMLA the employer, not the employee, determines whether an absence is designated as FMLA leave. However, Plaintiff has cited no evidence of a serious health condition entitling him to protection under FMLA. Indeed, Plaintiff denies that he was suffering from any impairment or illness at any time during his leave of absence. (Manna Dep., Defs.' Ex. 1, at 17:19-22 (Q: "Just to be clear, are you claiming that at any time during 2015 or 2014 that you had a disability or you had an impairment?" A: "No."); *id.* at 19:13-21:11.) Moreover, it is undisputed that Plaintiff did not seek to exercise any rights under FMLA. (*See id.* at 20:6-15 (stating that Plaintiff was "confused on why I was even put on FMLA in the first place when I never even asked"); *id.* at 157:2-10 (Q: "Now, I think that you got this, you hadn't really requested FMLA, you just got this form. Is that right?" A: "Right. Which was–yeah, I did not request it and just received it and was kind of confused about it because, you know, it says on this date you informed us I need to leave beginning on–well no, I didn't inform them, they told me. You know, it was the other way."); *id.* at 158:7-9 ("I didn't even know why my FMLA request was approved when I didn't even ask for the FMLA in the first place."); *see also id.* at 157:16 ("I don't think I ever sought FMLA.").)

Accordingly, Plaintiff has not established a genuine issue of fact as to whether he engaged in protected FMLA activity because he did not have a serious health condition at the time of his leave

and did not seek to exercise any rights protected by FMLA.[10]  Accordingly, Plaintiff cannot make out

a prima facie claim of FMLA retaliation, and Phillips is entitled to summary judgment on this claim.

### E.  Confessed Claims

Plaintiff has confessed his claims for discrimination by association under ADA and for

interference under FMLA.  Accordingly, Phillips is entitled to summary judgment on those claims.

## III.  ERISA Claim

### A.  Background[11]

Plaintiff seeks severance pay benefits under the Phillips 66 Severance Pay Plan (the "Plan"),

which is governed by ERISA.  Phillips is the primary employer, sponsor, fiduciary, and administrator

of the Plan, and was so at the time of Plaintiff's termination of employment.  The Plan provides, in

relevant part, as follows:

> Section 2 – Definitions . . .

> "Layoff or Laid Off" –The terms "Layoff or Laid Off" apply if (1) and (2) are met and if (3)
> does not apply to the termination:

> (1) . . . (a) the Company gives the Participant Notice of Layoff;

---

[10]  Plaintiff also has failed to cite evidence to support the third element, *i.e.*, causation. As explained above, Plaintiff admittedly never sought to exercise any right under FMLA. Plaintiff has not shown how a jury might reasonably infer causation where an employer chose of its own accord to place an employee on FMLA leave, only to terminate the same employee after he returned from leave.

[11]  Except as otherwise noted, the factual background set forth *supra* Part I is incorporated by reference herein.  Additional facts material to Plaintiff's claim for ERISA benefits are set forth here.  ERISA claims challenging the denial of benefits are typically replete with disputed questions of material fact which must be resolved by reference to the administrative record or remanded to the plan administrator for further proceedings. Consequently, the summary judgment standard of Rule 56 does not apply in review of ERISA benefits decisions, and the facts considered in this analysis need not be undisputed.  *See Tinkler v. Level 3 Commc'ns LLC*, No. 07-CV-259-CVE-FHM, 2008 WL 199901, at *7 (N.D. Okla. Jan. 22, 2008).

(b) The Participant's employment is involuntarily terminated with the Company and with all members of the Employer following such Notice of Layoff, on a date determined by the Company; and

(c) The facts are as described in (i), (ii) or (iii) below:

(i) the Participant is not a Tier 1 Executive Employee and the termination of employment is prior to a Change of Control and is caused by a reduction in force, a job elimination, a Corporate Event or is designated as a "Layoff" by the Chief Executive Officer of Phillips 66 Company, or

(ii) the Participant is a Tier 1 Executive Employee and the termination of employment is prior to a Change in Control and is designated as a "Layoff" by the Chief Executive Officer of Phillips 66 Company; or

(iii) the termination of employment is on or after a Change in Control and is either caused by a reduction in force, a job elimination, a Corporate Event or designated as a "Layoff" by the Chief Executive Officer of Phillips 66 Company. . . . ;

(3) Provided, however, whether or not the Company has given a Participant Notice of Layoff, the Participant's termination of employment shall not be considered a "Layoff" if any of the following apply:

(a) the Participant resigns . . . ;

(b) the Participant's employment is terminated because he failed to accept . . . a job offered by an Employer . . . ;

(c) the Participant's employment is terminated because he failed to accept . . . a job offered by an Employer . . . ;

(d) the Participant's employment is terminated because he failed to accept . . . a transfer job . . . ;

(e) The Participant accepts any transfer job . . . ; or

(f) The Participant transfers to a member of the ConocoPhillips controlled group[.]

(Administrative Record ("AR"), Doc. 40, at 4-5.)

Section 4. . . .

B.  Except as provided in Section 4(C) of the Plan, a Participant is eligible to receive benefits under the Plan if he has all Qualifying Circumstances and does not have a Disqualifying Circumstance.

    (1) A Participant has all Qualifying Circumstances if:

        (a) He has a Layoff on or after May 1, 2012;

        (b) He is Employee on the Date of Layoff; and

        (c) He has completed or will complete one Year of Service as of the Date of Layoff.

    (2) A Participant has a Disqualifying Circumstance, even if he has been given a Notice of Layoff, if:

        . . .

        (e) he is terminated for cause as indicated by the fact that his termination is recorded in the Company's or Employer's personnel system as a "discharge" or similar classification.

(*Id.* at 8-9.)

The Plan Administrator is authorized "to interpret and administer the Plan, including the resolution of ambiguities, inconsistencies and omissions" and "to determine benefit eligibility . . . and to make the initial findings of fact and resolution of disputes or claims." (*Id.* at 14.)  The Plan also provides that the Benefits Committee (the "Committee") has similar authority and the power to review and resolve disputes or claims which may arise under the Plan, following review and initial resolution by the Plan Administrator.  (*Id.* at 13.)

Plaintiff submitted a request for severance pay benefits under the Plan via a letter dated January 11, 2017.  (*Id.* at 150-52.)  By letter dated January 30, 2017, the Plan Administrator denied Plaintiff's claim ("Administrator's Decision"). (*Id.* at 166-67.)  On March 27, 2017 Plaintiff appealed the denial.  (*Id.* at 193-97.)  In support of his appeal, Plaintiff submitted documents and testimonial

evidence, including deposition testimony from Tarter, email correspondence after between Plaintiff and Ms. Ginyovszky regarding notice of leave from office, and Plaintiff's "Performance Agreements" from 2005, 2006, and 2008 through 2013. Plaintiff also requested the following information from the Plan:

1. Identification of specific days in 2014 through his lay off in August 2015 when Plaintiff failed to arrive until after 9:00 am.;

2. Identification of Plaintiff's absences from work, full or partial, after the May 21, 2015 Warning in which Defendant did not have prior notice of his absence;

3. Supporting documentation; and

4. Confirmation of the elimination of the Strategic Sourcing Group in Bartlesville.

(*Id.* at 196.) By correspondence dated May 12, 2017 (the "Committee Decision"), the Committee denied the appeal. (*Id.* at 284-85.) Plaintiff contends the Plan did not provide any of the requested information, respond to his questions, produce supporting documents for tardiness or absences, or address additional facts supporting his appeal. It is undisputed that Plaintiff exhausted his administrative remedies as required under ERISA.

## B.    Legal Standard

Plaintiff seeks review of the decisions of the Plan Administrator and the Committee pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). A denial of benefits challenged under § 1132(a)(1)(B) is subject to de novo review "*unless* the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.,* 489 U.S. 101, 116 (1989) (emphasis added). In the latter case, a more deferential standard is appropriate. *Id.* at 110-11 (explaining that "ERISA abounds with language and terminology of trust law" and that "a deferential standard of review [is] appropriate

when a trustee exercises discretionary powers").  It is undisputed that the Plan authorizes the Plan Administrator to interpret and administer the plan and to determine benefit eligibility, and therefore the more deferential arbitrary and capricious standard is applicable.

However, if a conflict of interest is present, "that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Id.* at 115 (citing Restatement (Second) of Trusts § 187, cmt. d (1959).)  Plaintiff contends the Plan Administrator operated under a conflict of interest because the Plan is self-funded by Phillips, Phillips appointed and compensated the Plan Administrator, and the Plan had access to the value of Plaintiff's benefit claim during its review.  The Plan disputes that these elements are sufficient to warrant greater scrutiny.  However, the level of deference given to a plan administrator's decision may be "decrease[d] in proportion to the seriousness of the conflict," creating "in effect a sliding scale of judicial review." *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1044 (10th Cir. 2004) (internal citation and quotation omitted).  "The importance [courts] attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision." *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009).  Therefore, the Court finds it appropriate here to "take account of several different considerations of which a conflict of interest is one." *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 110 (2008).

### C.      Analysis

Plaintiff contends that his job was eliminated, and therefore his termination was a "Layoff" as defined in the Plan, rather than a termination for cause, entitling him to severance pay under the Plan.  An employee benefit plan must afford a reasonable opportunity for a full and fair review of the denial of benefits to any participant.  29 C.F.R. § 2560.503-1(h)(2)(iv).  The Committee Decision

states Plaintiff was not laid off but instead was terminated for his "continued failures following the [May 21, 2015] written warning." (AR at 284.) The Committee Decision states in general terms that Plaintiff "failed to demonstrate any significant improvement in [his] performance and did not demonstrate the commitment necessary to ensure the timely completion of several projects and goals" after being given the May Warning. (*Id.*) However, it cites no documentation of this alleged failure, either with regard to work performance, timely completion of projects, or hours. Both the Administrator's Decision and Committee Decision cite Plaintiff's 2014 performance review, but because Phillips never issued a 2015 mid-year review to Plaintiff before terminating him, the Plan may have placed undue weight on the 2014 review. Moreover, the record lacks evidence of noncompliance with the May Warning other than on July 14 and 15, 2015, when Plaintiff was traveling to or in Houston. Significantly, neither the Administrator's Decision nor the Committee Decision cites or refers to any item in the record dated later than May 21, 2015 indicating that Plaintiff failed to comply with the May Warning. Both decisions also fail to acknowledge that Ginyovsky, worked in the Houston office and did not keep time records for Plaintiff's work hours or require Plaintiff to report time, and fail to address that Plaintiff was not placed on a formal performance improvement plan before being terminated.

Furthermore, the Committee Decision ignores evidence in the record that Plaintiff complied with the May Warning. In his March 27, 2017 appeal letter, Plaintiff submitted documentation including communications informing Ginyovsky of times when Plaintiff would be out of the office. The Committee Decision does not acknowledge or otherwise address these records. In addition, the Committee failed to respond to Plaintiff's requests for information, including dates on which Plaintiff was allegedly absent without notice and any supporting documentation.

21

The Plan also contends Plaintiff did not qualify for severance pay because Plaintiff did not receive a written Notice of Layoff, as required by the Plan. To the extent the Plan seeks to rely on formal designations or actions entirely within the employer's control, the Court finds greater scrutiny under the "sliding scale" is warranted. The Court is unwilling to find Plaintiff ineligible for benefits under the Plan based only on circumstances under Phillips' control. Additionally, the Committee Decision is not based on the absence of a formal Notice of Layoff but on the determination that Plaintiff was terminated for cause. In noting that Plaintiff did not receive a Notice of Layoff, the Committee emphasized that it was *because* Plaintiff was terminated for cause that he did not receive a Notice of Layoff. However, as noted, the record lacks adequate evidence supporting the employer's justification for terminating Plaintiff. Accordingly, Plaintiff's supposed termination for cause does not itself excuse the employer's failure to provide Plaintiff with a Notice of Layoff.

For these reasons, the Plan's decision to deny Plaintiff's claim for severance pay was arbitrary and capricious. The Administrator's Decision and Committee Decision therefore are reversed, and Plaintiff's claim for benefits is remanded to the Plan for further findings and explanation.

## IV. Conclusion

Defendant Phillips 66 Company's Motion for Summary Judgment (Doc. 49) is GRANTED. An order of judgment will be entered separately.

Pursuant to Section 502(a)(1)(B) of ERISA, the denial of Plaintiff's claim for severance pay benefits under the Plan is REVERSED AND REMANDED for further proceedings consistent with this Opinion and Order.

**SO ORDERED this 17th day of January, 2018.**

**TERENCE KERN**
**United States District Judge**

22